IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JESS KRUCHOSKI,<br><br>      Plaintiff.<br><br>v.<br><br>MIMEDX GROUP, INC. and<br>PARKER H. PETIT,<br><br>      Defendants. | CIVIL ACTION<br>FILE NO. |

## COMPLAINT

Plaintiff Jess Kruchoski, for his Complaint against Defendants MiMedx Group, Inc. and Parker H. "Pete" Petit, states and alleges as follows:

## I. INTRODUCTION

1.     Plaintiff Jess Kruchoski ("Kruchoski") is a former employee of MiMedx Group, Inc. ("MiMedx" or the "Company"), a publicly-traded company with about 500 employees. During his four-year tenure at MiMedx, Kruchoski was a top-performing sales manager. Kruchoski also helped develop his subordinate, Luke Tornquist, into MiMedx's number one sales representative in the United States.

2.     Over the course of his employment, Kruchoski discovered that the Company was engaged in a fraudulent revenue recognition scheme orchestrated by MiMedx's executive leadership, including the Company's CEO, Parker H. "Pete" Petit ("Petit"). MiMedx employed this fraudulent revenue recognition scheme to artificially inflate quarterly revenue and deceive its investors.

3.     Kruchoski reported and opposed MiMedx's fraud. MiMedx in turn retaliated against Kruchoski with threats, intimidation, and ultimately, termination after a retaliatory investigation.

## II. PARTIES

4.     Kruchoski resides in Wisconsin and intends to remain there indefinitely.

5.     MiMedx is a Florida corporation with its principal place of business in Marietta, Georgia.

6.     Petit resides in Georgia and intends to remain there indefinitely.

## III. JURISDICTION AND VENUE

7.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and exclusive federal question jurisdiction pursuant to 15 U.S.C. §§ 78aa(a) and 76u-6(h)(1)(B)(i)  with respect to Count One of this Complaint, and supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367(a).

8.     Furthermore, this Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332, as the Plaintiff, on the one hand, and the Defendants, on the other hand, are citizens of different States, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

9.     Venue is appropriate because: (a) MiMedx and Petit reside in the Northern District of Georgia; and (b) a substantial part of the events giving rise to the claims described herein occurred within the Northern District of Georgia.

## IV. FACTS

### A.     DEFENDANTS' BACKGROUND

10.     Human placental tissue has been used for decades to promote wound healing. The amnion and chorion layers of the amniotic membranes are rich in growth factors that support the healing process.

11.     Due to logistical issues surrounding the availability of fresh amnion, risks of blood-borne pathogens, and the need for surgeons to source from their own hospitals' OB-GYN ward, the use of amnion (*i.e.*, the innermost membrane that encloses the embryo) was never commercially viable.

12.     That has changed. One of MiMedx's subsidiaries developed a proprietary method that safely and effectively manipulates placental tissue to create implants for a wide variety of surgical applications. Essentially, the process

involves dehydrating and sterilizing the tissue. The process gives the tissue a shelf life of up to five years at ambient room temperature. MiMedx has developed a number of products for acute and chronic wound care as a result of this proprietary method.

13.     The product primarily at issue here is EpiFix, which is a dehydrated human amnion/chorion membrane tissue graft composed of a layer of epithelial cells, a basement membrane, and an avascular connective tissue matrix.

14.     At all relevant times, Petit has been the CEO and Board Chairman of MiMedx.

## B.     PLAINTIFF'S BACKGROUND

15.     Kruchoski is a former MiMedx employee. In July 2012, he started his employment at MiMedx as an Account Executive of Government Sales for the company's Wisconsin and Minnesota territories.

16.     In October 2013, MiMedx promoted Kruchoski to Regional Sales Director of the North Central Region (which included Minnesota). He held this position until his termination on December 12, 2016.

17.     During his employment, Kruchoski frequently performed work on behalf of MiMedx in Minnesota.  By way of example only, and not limitation, in his last year of employment at MiMedx Kruchoski visited Minnesota eight times to

4

perform services for the Company. During these visits, Kruchoski met with MiMedx sales representatives to provide sales support and coaching. On at least four occasions during this time period, Kruchoski accompanied MiMedx sales representatives on visits with customers to observe and provide feedback on representatives' performance.

## C. MiMedx's Fraudulent Revenue Recognition Scheme

18. Since at least 2014, MiMedx has engaged in a scheme of "channel stuffing" in which the Company fraudulently recognizes revenue in its certified financial statements before the revenue has been realized or realizable and earned.

19. The channel-stuffing scheme is simple: at the direction and pressure of MiMedx's executive officers and senior management, MiMedx sales representatives order EpiFix grafts for delivery to Department of Veterans Affairs ("VA") hospitals throughout the country.

20. Under the scheme, MiMedx sends its product directly to VA hospitals, where MiMedx sales representatives are responsible for procuring sales of the products, managing MiMedx product on the shelves, tracking MiMedx inventory on the shelves, and accounting for any lost or damaged product. MiMedx ships this product despite the fact that the VA hospitals neither ordered, nor possessed any need for, any such product.

21.    MiMedx then claims these orders as revenue to meet its quarterly forecasts.

22.    The VA hospitals are typically unaware of the channel-stuffing orders, much less the volume of MiMedx's products in their possession.

23.    The channel-stuffing scheme implicates AvKARE, Inc. ("AvKARE"), a Tennessee company and Federal Supply Schedule ("FSS") contractor. In 2014, MiMedx entered into a distribution agreement with AvKARE, which allowed MiMedx to sell directly to government accounts, including the VA. Although MiMedx obtained its own FSS contract in 2015, MiMedx and AvKARE extended their distribution agreement through June 30, 2016, and then again until June 30, 2017.

24.    Neither AvKARE nor the end customer—the VA—requests the EpiFix orders that are involved in MiMedx's fraudulent revenue recognition scheme.

25.    At no point in the distribution channel does AvKARE exercise physical control over the product, assume the risks and rewards of ownership, or otherwise play a role in reselling the product to the end customer.

26.    The channel stuffing routinely occurs at the end of each financial quarter.

27.     In the last month of 2015, over $10 million of MiMedx products was sitting on VA hospitals' shelves, which the hospitals had neither bought nor requested.

28.     MiMedx engaged in this "channel stuffing" scheme with the intent of slowly feathering back returns over time, concealing the return of product it had previously recognized as revenue by balancing them against actual revenue in future reporting periods.

## D.    THE APPLICATION OF ACCOUNTING PRINCIPLES TO MIMEDX'S CHANNEL-STUFFING SCHEME

29.     The Financial Accounting Standards Board ("FASB")—recognized by the Securities and Exchange Commission as the designated accounting standard setter for public companies—promulgates Generally Accepted Accounting Principles ("GAAP") on revenue recognition.

30.     Under FASB Accounting Standard No. 48, if an enterprise sells its product but gives the buyer the right to return the product, revenue from the sales transaction shall be recognized at time of sale only if all of the following conditions are met:

        a. The seller's price to the buyer is substantially fixed or determinable at the date of sale;

b. The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product;

c. The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage to the product;

d. The buyer acquiring the product for resale has economic substance apart from that provided by the seller;

e. The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer;

f. The amount of future returns can be reasonably estimated. The following factors may impair the ability to make a reasonable estimate:

   i. Susceptibility of product to significant external factors, such as technological obsolescence or changes in demand;

   ii. Relatively long periods in which a particular product may be returned;

   iii. Absence of historical experience with similar types of sales of similar products, or inability to apply such experience because of changing circumstances;

iv.   Absence of a large volume of relatively homogeneous transactions;

v.   Other factors that preclude a reasonable estimate.

Sales revenue and cost of sales that are not recognized at time of sale because the foregoing conditions are not met shall be recognized either when the return privilege has substantially expired or if those conditions subsequently are met, whichever occurs first.

31.   MiMedx's revenue recognition scheme does not comport with GAAP. Even if there is a transaction between AvKARE and MiMedx at the time of shipment, a number of contingencies preclude MiMedx from properly recognizing this revenue at the time of shipment. For instance:

a.   *MiMedx maintains liability for lost or damaged products allegedly "sold" to AvKARE and placed on VA hospitals' shelves.* Whether it is a condition of a formal, written agreement, an oral side agreement, or established practice, MiMedx has agreed to accept liability returns on product placed on the shelves.  In this event, MiMedx must credit AvKARE for returned, lost, or damaged product. There also remains a distinct possibility that the VA (or AvKARE) could send back the unpurchased product sitting on their shelves at any time.

b. *MiMedx has significant obligations for future performance to directly bring about resale of the product by the buyer.* MiMedx sales representatives work on location at VA hospitals throughout the country and market the product. AvKARE plays no role in procuring customer sales of the products it has allegedly purchased from MiMedx.

c. *The amount of future returns cannot be reasonably estimated.* Whether it is a condition of a formal, written agreement, an oral side agreement, or established practice, there are relatively long periods in which EpiFix products may be returned. There is still unpurchased EpiFix product that MiMedx shipped in the first quarter of 2016 that MiMedx recognized as revenue. Even worse, MiMedx was aware at the time of recognizing product sales as revenue that the same EpiFix products would have to be returned in future quarters because of a lack of demand.

32.   SEC Staff Accounting Bulletin No. 101, 64 Fed. Reg. 68936 (Dec. 3, 1999) (codified at 17 C.F.R. § 211) states that transactions within the scope of specific authoritative accounting literature should be applied. Further, the SEC will consider existing accounting standards as well as broad revenue recognition

criteria specified in the FASB's conceptual framework that provide basic guidelines for revenue recognition.

33.    Based on FASB guidelines, the SEC has concluded that revenue should not be recognized until it is realized or realizable and earned. Revenue is generally realized or realizable and earned when all of the following criteria are met:

   a.  Persuasive evidence of an arrangement exists;

   b.  Delivery has occurred or services have been rendered;

   c.  The seller's price to the buyer is fixed or determinable; and

   d.  Collectibility is reasonably assured.

34.    In the context of consignment arrangements, the SEC holds that the presence of conditions set forth in FASB Accounting Standard No. 48 in a transaction precludes revenue recognition even if title to the product has passed to the buyer.

35.    Nevertheless, MiMedx publicly recognizes the shipment of this inventory as revenue in its filings with the Securities and Exchange Commission.

36.    In its certified filings, MiMedx has failed to adequately disclose its practice of recognizing revenue upon shipment to VA facilities even in the absence

of an executed purchase order or payment from a customer. Moreover, MiMedx fails to adequately disclose the contingent nature of these alleged sales.

37.    With respect to accelerated, discounted sales that are realized and earned in the reporting quarter, MiMedx has failed to provide any disclosures in financial statements that it accelerated material amounts of sales revenue as a business practice and discuss its financial implications for future periods. Finally, MiMedx has failed to disclose its practice of slowly feathering back returns.

38.    The failure to provide these disclosures results in the artificial inflation of MiMedx's revenue for current reporting periods. The implication for future reporting periods is foreseeable: MiMedx cannot recognize revenue from many *actual* government sales—those transactions that occur when the VA actually purchases MiMedx's products—because the company has already declared revenue from those products in previous quarters. Further, if the VA were to return products that it had never ordered, MiMedx would earn nothing from a transaction it has already reported as revenue in its certified filings.

## E.    KRUCHOSKI OBJECTS TO MIMEDX'S REVENUE RECOGNITION SCHEME

39.    Kruchoski consistently objected to MiMedx's fraudulent revenue recognition scheme and reported his belief that the scheme was unlawful to the Company's executives.

40.     On December 28, 2015, MiMedx's Government Market Development Manager, Matt Bloemer, called Kruchoski.

41.     At the direction of MiMedx senior management, Mr. Bloemer called Kruchoski to determine how much product MiMedx could place on VA hospital shelves in the North Central Region before the end of the month. By way of explanation, Mr. Bloemer said that the company was "way behind" on its projected revenue.

42.     Mr. Bloemer told Kruchoski that he would be getting a call from Lou Roselli, MiMedx's Senior Director of Operations, asking Kruchoski to add superfluous product to the shelves of VA hospitals within his sales region.

43.     Kruchoski told Mr. Bloemer he believed this practice was illegal and that he should have someone from upper management send an email with such a request. Mr. Bloemer laughed and said, "You know that's not going to happen."

44.     No one from upper management sent Kruchoski such a request in writing.

45.     Instead, two days later, on December 30, 2015, Mr. Roselli called Kruchoski. Mr. Kruchoski expressed his concerns about the scheme MiMedx was asking him to carry out:

Mr. Kruchoski:     It's like—basically what—correct me if I'm wrong, but we're trying to hit a number with

13

unimplanted grafts, you know. It's basically the 0-8—the Osiris—what they got, you know, taken to task for. I mean we're going to be able to [probably put up] $100,000 this month or in the last week here and Mike Wilson just put in a big order yesterday. But that—that's even a stretch. And what happens is every time we do this, we put ourselves in jeopardy with the accounts. Especially right now as tissues are being tracked like crazy.

46.     At this point, Mr. Roselli told Kruchoski that Petit ordered the MiMedx sales force to submit false orders for unpurchased product for the purpose of recognizing the "revenue" in the company's financial statements:

Mr. Roselli:            No, I—look, I get it. I—I've sat on the other side of the table and I've been asked to do it, you know. And now I'm on the other side asking everybody to do it too, you know. What I'll tell you is that—I mean, if you can do it you know, and just don't want to do it, and orders come through—this is—this is right out of Pete's mouth. So this is the— Pete says—I [unintelligible]—I fully understand the risk that we're taking. We share the same risk with him. And he said: But this is a company directive. So if they can help, they need to help. And if they don't and orders come through between now and [team meeting]—this is the only time I've ever heard him cuss. He said: Their as is grass. So I'm just—I'm just putting it out there. I don't want to see anybody in trouble became an order came in in January that he didn't want to come in, you know.

14

. . . .

47.     Mr. Kruchoski then expressed his concern about the legality of this

directive:

| | |
|---|---|
| Mr. Kruchoski: | But you—you're basically saying a manager or a—like a representative of this company, his job is at risk or their ass is at risk if they— |
| Mr. Roselli: | That's what he said |
| Mr. Kruchoski: | —if they don't load a shelf with a false order in order to meet a street number. |
| Mr. Roselli: | That is not— |
| Mr. Kruchoski: | That is—that is something every [SEC] attorney would want to know in America. |

. . . .

| | |
|---|---|
| Mr. Kruchoski: | [W]hat cracks me up about this is I've sat in Pete's office talking about the practices of ABH, that he wants to separate and distance himself from. |
| Mr. Roselli: | Yep. |
| Mr. Kruchoski: | And yet here we are right now in this moment doing something that was an ABH—like total 100-percent ABH go-to, stocking freezers, loading freezers. Let's give them a number so that we can inflate that stock price. That's just crazy to me. And the thing is we already have our—we do this |

every month so our shelves are absolutely overflowing.

. . . .

48.    At this point, Mr. Roselli revealed a plan to bring the tissues back to

MiMedx at the end of the second quarter of 2016:

> Mr. Roselli:    By—by June—by June we're gonna take credit for all this stuff back anyways. We're bringing all this back. It's—we're gonna credit AvKARE. Every single account is gonna be under the [MiMedx FSS] in June.[1] No question about it.

> Mr. Kruchoski:    Isn't that a false representation of our revenue, though? Isn't that a false representation of—because we're gonna credit this back next year. This is what [redacted] used to do is writing stuff off the books that we had . . .

49.    At the very least, Petit wanted sales expected for the first quarter of

2016 to be submitted to MiMedx as a current-quarter sale. However, based on the

volume of channel-stuffing MiMedx was demanding of its sales representatives,

the practice extended beyond the acceleration of sales by a quarter.

---

[1] This assertion turned out to be untrue. Despite having the ability to sell directly to the VA hospitals under its own FSS contract, MiMedx extended its distribution agreement with AvKARE through June 30, 2017, and many tissues remained on the shelves as "AvKARE consignment."

50.     Kruchoski received continued requests from senior MiMedx management to "stuff the shelves" in the final month of each quarter through about June 2016.

## F.     MiMedx Unlawfully Denies Kruchoski a Promotion

51.     On January 4, 2016, MiMedx's then-Executive Vice President of the Company's Wound Care division, Mike Carlton, told Kruchoski that he would not be considered for a promotion to an open Area Vice President position within the Company.   Instead, the Company promoted Steve Blocker (another MiMedx employee) into that position. MiMedx did so without conducting interviews with any other candidates (including Kruchoski) or even posting the position within the Company.

52.     Mr. Blocker had been Kruchoski's subordinate from October 2013 to February 2014 and had less tenure at MiMedx. Kruchoski was also a better performer than Mr. Blocker.

53.     During their January 4, 2016 call, Mr. Carlton did not indicate that Kruchoski's performance was lacking or otherwise a factor in the Company's decision to pass him over for the Area Vice President promotion.

54.    Instead, Mr. Carlton told Kruchoski he was not considered for the promotion on the grounds that Kruchoski was "too vocal" in his objections to MiMedx's shelf-stuffing scheme.

## G.    MiMedx's Fraudulent Revenue Recognition Scheme Continues and Enlarges

55.    On January 15, 2016, MiMedx's Executive Vice President and Chief Commercial Officer, Chris Cashman, sent an internal memo to the entire Company describing the aggressive shelf-stuffing practices of Osiris, a MiMedx competitor.

56.    After reading that email, Kruchoski called his new supervisor, Mr. Blocker, and expressed his concern that MiMedx was doing the exact same thing as Osiris. Mr. Blocker confirmed that Kruchoski might be right. On information and belief, Mr. Blocker made no further investigation of Kruchoski's report.

57.    On March 28, 2016, MiMedx Chief Operating Officer Bill Taylor sent out a company-wide memorandum stating that the company's sales reporting and its sales to AvKARE were "complex" and that the Company's financial statements met GAAP standards of revenue recognition.

58.    That same day, Kruchoski received word that Mr. Cashman and Executive Vice President of Operations Mark Diaz had developed a scheme of filling FedEx packages about the size of a shoebox with EpiFix and covertly sending them to VA hospitals around the country.

18

59.     MiMedx addressed these shipments to the attention of a particular VA clinic, *e.g.*, podiatry. Under this scheme, a "shoebox" of EpiFix product would arrive in a VA hospital's shipping and receiving department–despite the fact that the VA never ordered this product.

60.     MiMedx executed multiple orders for fifteen of MiMedx's most expensive grafts (7 cm x 7 cm EpiFix) and shipped them to VA hospitals without a purchase order from the VA or the VA even knowing about the shipment. In some cases, the shipments occurred without the knowledge of the MiMedx sales representatives handling the VA accounts that received this excess product.

61.     Between March 22, 2016 and March 31, 2016—at the tail-end of MiMedx's first fiscal quarter of 2016—MiMedx sent *at least 330 7x7 EpiFix grafts* to 17 VA hospitals across the country. On information and belief, MiMedx sent at least an additional *60 7x7 grafts* in packages that contained additional sizes to three other VAs.

62.     Therefore, at minimum, MiMedx sent at least *390 7x7 EpiFix grafts* in the final four days of Q1 2016, mostly to VA accounts that typically use *less than five 7x7 EpiFix grafts* throughout the entire year.

63.     In all, MiMedx sent, at minimum, between $2,098,640 and $2,372,393 of product to 20 VAs in the last four days of Q1 2016, even though no VA hospital had ordered any of this product.

64.     Consistent with Mr. Roselli's prior statements to Kruchoski, MiMedx understood at the time it recognized these shipments as revenue that most of the 7x7 grafts would be slowly returned with coordination from MiMedx management. MiMedx further planned to conceal losses associated with these returns with revenue from future fiscal quarters.

65.     As of November 2016, most of these 7x7 EpiFix grafts have remained unused and unpurchased by the end customer, have been returned to MiMedx, or have been concealed in some way by MiMedx sales representatives until MiMedx authorizes the return. In at least one case, a sales representative, who was working at a VA with an inventory management system, intercepted a "shoebox" before the VA inventoried its contents. MiMedx directed at least two sales representatives to store EpiFix grafts at their personal residences.

66.     In the fall of 2016, Kruchoski persuaded the Minneapolis VA hospital to purchase approximately $461,000.00 worth of MiMedx products already on the hospital's shelves. Under the Company's then-current commission structure, the sale entitled Kruchoski and Mr. Tornquist to certain commissions.

67.    However, MiMedx denied, and continues to deny, commissions due and owing Kruchoski and Mr. Tornquist from this large-scale VA purchase.

## H.    KRUCHOSKI AND MR. TORNQUIST REPORT LEGAL VIOLATIONS TO MIMEDX AND ARE IMMEDIATELY SUBJECT TO RETALIATION

68.    On November 2, 2016, Kruchoski and Mr. Tornquist submitted a joint report to MiMedx management and legal counsel—Petit; Mr. Blocker; Mr. Cashman; General Counsel and Secretary Alexandra O. Haden; Executive Vice President of Wound Care Sales Kevin Lilly; and President, COO, and Board Member William C. Taylor—their belief that the Company was engaged in a fraudulent revenue recognition scheme in violation of Sarbanes-Oxley and that the Company had failed to pay commissions to them in violation of Minnesota, Wisconsin, and Georgia statutes.  (Exhibit 1 at 3–4).

69.    On November 3, 2016, Mr. Tornquist received a phone call from Mr. Blocker. During that phone call, Mr. Blocker brought up Kruchoski and Mr. Tornquist's report of Sarbanes-Oxley violations. Mr. Blocker asked Mr. Tornquist if he really wished to sign onto that portion of the joint report. Mr. Blocker warned Mr. Tornquist that doing so would "not be good for" him. He reminded Mr. Tornquist that he had a wife and children and cautioned Mr. Tornquist to "think of [his] family."

70.     That same day, Mr. Blocker also called Kruchoski and said that he and Mr. Tornquist "should think about their families," or words to that effect.

71.     That same day, Kruchoski received a phone call from a co-employee. The co-employee reported that Mr. Blocker had outed Kruchoski as a whistleblower to Kruchoski's co-employees.

72.     Also that same day, Kruchoski also received a response from Ms. Haden. In her response, Ms. Haden falsely asserted that Kruchoski had asked MiMedx "to assist in shielding income" from his former spouse. (*See* Exhibit 1 at 2).

73.     On November 4, 2016, Kruchoski and Mr. Tornquist supplemented their joint letter individually to set forth MiMedx's fraudulent revenue recognition scheme in greater detail.  (*See* Exhibit 1 at 1).

74.     On November 7, 2016, ***one business day*** after Kruchoski's report spelling out the fraudulent revenue recognition scheme in detail, Thornton Kuntz, Senior Vice President of Administration and Human Resources, placed Kruchoski on a performance improvement plan, which threatened termination. (Exhibit 2).

75.     This performance improvement plan skipped several levels of progressive discipline outlined in MiMedx's personnel policies. (*Id*.). In the

performance improvement plan, Mr. Kuntz reprimanded Kruchoski for his protected report. (*Id*.).

76.    On November 18, 2016, MiMedx employee Adam Dach flew to Atlanta, Georgia to meet with upper management, who interviewed Mr. Dach for an expansion of his territory consisting of most of Kruchoski's territories.

77.    Also on this day, Kevin Lilly, the Executive Vice President of Wound Care Sales, called one of Kruchoski's subordinates to "gauge his interest in management."

78.    On November 21, 2016, Mr. Blocker called another one of Kruchoski's subordinates to see if he would be interested in a potential management role.

79.    That same day, Ms. Haden interviewed Kruchoski and Mr. Tornquist, during which time Kruchoski and Mr. Tornquist provided additional information related to MiMedx's fraudulent revenue recognition scheme. During that interview, Kruchoski and Mr. Tornquist repeatedly stated that they feared retaliation for their reporting. At no time did Ms. Haden assure Kruchoski or Mr. Tornquist that they would be free from retaliation.

80.    At 11:54 p.m. that evening, Kruchoski learned that Mr. Blocker had made progress on Kruchoski's replacement.

81.    On November 22, 2016, MiMedx informed Kruchoski that it was cutting his commissionable geography by removing Iowa, Nebraska, North Dakota, and South Dakota from his territory—resulting in estimated monthly commission losses of $3,500 to $4,000.

82.    MiMedx tried to characterize this territory reduction as part of a plan that predated Kruchoski's November 2, 2016 and November 4, 2016 reports. However, during a meeting on October 19, 2016, Mr. Blocker had informed Kruchoski that his region would not be touched in a company-directed initiative to realign regions. Depriving Kruchoski of his territories would result in major territory disparities between Regional Sales Directors, and the decision to do so was made only after Kruchoski's protected reports.

83.    On November 22, 2016, MiMedx agreed to mediate its dispute with Kruchoski and Mr. Tornquist. MiMedx agreed to mediate for the sole purpose of delaying Kruchoski's and Mr. Tornquist's filing of a lawsuit, so that MiMedx could in turn complete a retaliatory investigation against Kruchoski and Mr. Tornquist and file anticipatory suits.

84.    On or around November 29, 2016, Mr. Roselli contacted several MiMedx co-employees and asked about alleged misconduct on the part of Kruchoski and Mr. Tornquist.

85.     On December 12, 2016, MiMedx attended a mediation with Kruchoski and Mr. Tornquist in Minneapolis, Minnesota. That same day, Petit claimed during a meeting at MiMedx headquarters in Marietta, Georgia that the company was going to hurt Kruchoski's and Mr. Tornquist's careers and their families.

86.     Later in the evening of December 12, 2016, MiMedx, through its outside counsel, terminated Kruchoski and Mr. Tornquist simultaneously in Minneapolis, Minnesota.

87.     The next day, on December 13, 2016, MiMedx filed a lawsuit against Mr. Tornquist in Georgia state court and added Kruchoski to a Florida lawsuit filed on December 12, 2016.

88.     After Kruchoski's termination, MiMedx, through Petit, accused Kruchoski and Mr. Tornquist of being among a group of individuals that had "published false [sic] information about MiMedx in an attempt to discredit the positive relationship [the Company has] with the Veterans Administration." (Exhibit 3). This statement is false, retaliatory, and defamatory. MiMedx and Petit have made other false statements about Kruchoski affecting his profession or business in retaliation for his reports of MiMedx's unlawful activity.

## COUNT ONE

### RETALIATION IN VIOLATION OF
### THE DODD-FRANK ACT, 15 U.S.C. § 78u-6(h)
### (Against MiMedx)

89.    Plaintiff re-alleges Paragraphs 1-90 of this Complaint as if fully set forth herein.

90.    Under the Dodd-Frank Act, no employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done in making disclosures that are protected under the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7201 *et seq.*

91.    Defendant MiMedx took adverse action against Plaintiff because of his reports of conduct that would violate Section 906 of the Sarbanes Oxley Act, 18 U.S.C. §1350(c); Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q; Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j; and Rule 10b-5 of the Securities Exchange Act, 17 C.F.R. § 240.10b-5.

86.    Defendant failed to take all reasonable steps to prevent retaliation against Plaintiff from occurring.

87.    Defendant's retaliatory conduct has adversely affected Plaintiff's status as an employee.

88.     Defendant's retaliatory conduct might have dissuaded a reasonable person from making or supporting a report.

89.     The unlawful employment practices complained of above were intentional and were performed by Defendant with malice or reckless indifference to the Plaintiff's rights under the Dodd-Frank Act.

90.     As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages.

## COUNT TWO

### UNLAWFUL DISCHARGE IN VIOLATION OF
### MINNESOTA STATUTES SECTION 181.931 SUBDIVISION 1(1)
### (Against MiMedx)

91.     Plaintiff re-alleges Paragraphs 1-90 of this Complaint as if fully set forth herein.

92.     At all relevant times, Plaintiff was an employee as defined in Minnesota Statutes section 181.931 subdivision 2, as he performed services for hire in Minnesota for his employer, MiMedx.

93.    At all relevant times, Defendant was an employer as defined in Minnesota Statutes section 181.931 subdivision 3, as it had one or more employees in Minnesota.

94.    Minnesota Statutes section 181.932 subdivision 1(1) prohibits retaliation against employees for making good-faith reports of violations of law. The statute prohibits retaliation against an employee because the employee, in good faith, reports a planned, suspected, or actual violation of any federal or state law or common law or rule adopted pursuant to law to an employer.

95.    Plaintiff reported what he reasonably and in good faith believed to be a planned, actual, or suspected violations of law, including but not limited to Minn. Stat. 181.101; Chapter 109 of the Wisconsin Statutes; Georgia Code 34-7-2; Section 906 of the Sarbanes Oxley Act, 18 U.S.C. §1350(c); Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q; Section 10(b) of Securities Exchange Act of 1934, 15 U.S.C. § 78j; and Rule 10b-5 of the Securities Exchange Act, 17 C.F.R. § 240.10b-5.

96.    Defendant took adverse action against Plaintiff because of his reports.

97.    Defendant failed to take all reasonable steps to prevent retaliation against Plaintiff from occurring.

98.   Defendant's retaliatory conduct has adversely affected Plaintiff's status as an employee.

99.   Defendant's retaliatory conduct might have dissuaded a reasonable person from making or supporting a report.

100.  The unlawful employment practices complained of above were intentional and were performed by Defendant with malice or reckless indifference to Plaintiff's rights under Minnesota Statutes section 181.932 subdivision 1(1).

101.  As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages.

**COUNT THREE**

**DEFAMATION IN VIOLATION OF**
**O.C.G.A. §§ 51-5-1 *et seq.***
**(Against MiMedx)**

100.  Plaintiff re-alleges Paragraphs 1-90 of this Complaint as if fully set forth herein.

101.  Defendant made false and defamatory statements about Plaintiff to others in reference to his trade or profession.

102.   These statements had the tendency and were intended to harm Plaintiff's reputation in his trade or profession.

103.   The recipients of these false statements can reasonably understand that the statements refer to Plaintiff.

104.   Defendant maliciously intended to injure Plaintiff in his trade, office, or profession by Defendant's false statements and succeeded in its malicious intent.

105.   As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages.

### COUNT FOUR

### DEFAMATION IN VIOLATION OF
### O.C.G.A. §§ 51-5-1 *et seq.*
### (Against Petit)

106.   Plaintiff re-alleges Paragraphs 1-90 of this Complaint as if fully set forth herein.

107.   Defendant made false and defamatory statements about Plaintiff to others in reference to his trade or profession.

108. Defendant's statements had the tendency and were intended to harm Plaintiff's reputation in his trade or profession.

109. The recipients of these false statements can reasonably understand that the statements refer to Plaintiff.

110. Defendant maliciously intended to injure Plaintiff in his trade, office, or profession by Defendant's false statements and succeeded in his malicious intent.

111. As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages.

## COUNT FIVE

### COMMON LAW DEFAMATION
### (Against MiMedx)

112. Plaintiff re-alleges Paragraphs 1-90 of this Complaint as if fully set forth herein.

113. Defendant made false and defamatory statements about Plaintiff to others.

114.   These statements had the tendency and were intended to harm, and continue to harm, Plaintiff's reputation.

115.   The recipients of these false statements can reasonably understand that the statements refer to Plaintiff.

116.   Defendant maliciously intended to injure Plaintiff by its false statements and succeeded in its malicious intent.

117.   As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages.

## COUNT SIX

### COMMON LAW DEFAMATION
### (Against Petit)

118.   Plaintiff re-alleges Paragraphs 1-90 of this Complaint as if fully set forth herein.

119.   Defendant made false and defamatory statements about Plaintiff to others.

120.   These statements had the tendency and were intended to harm, and continue to harm, Plaintiff's reputation.

121.   The recipients of these false statements can reasonably understand that the statements refer to Plaintiff.

122.   Defendant maliciously intended to injure Plaintiff by his false statements and succeeded in its malicious intent.

123.   As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays:

a. That the practices of Defendants complained of herein be adjudged, decreed, and declared to be in violation of the rights secured to Plaintiff by law;

b. That Defendants be required to make Plaintiff whole for Defendants' adverse, discriminatory, retaliatory, and unlawful actions through restitution in the form of back pay, with interest of an appropriate inflation factor;

c.  That Plaintiff be awarded front pay and the monetary value of any employment benefits he would have been entitled to as an employee of MiMedx Group, Inc.;

d.  That Plaintiff be awarded compensatory damages in an amount to be determined at trial;

e.  That the Court enjoin Defendants from engaging in the practices complained of herein;

f.   That Plaintiff be awarded punitive damages as permitted by statute;

g.  That Plaintiff be awarded treble damages as permitted by statute;

h.  That Plaintiff be awarded liquidated damages as permitted by statute;

i.   That Plaintiff be awarded any civil penalties as permitted by statute.

j.   That the Court award Plaintiff his attorneys' fees, costs and disbursements pursuant to statute; and

k.  That the Court grant such other and further relief as it deems fair and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS WHERE AVAILABLE.**

Respectfully submitted this 15th day of February, 2017.

**HALL, ARBERY, GILLIGAN,
ROBERTS & SHANLEVER, LLP**

*/s/ David Allen Roberts*
David Allen Roberts
Georgia Bar No. 608444
3340 Peachtree Road, NE, Suite 1900
Atlanta, GA 30326
Telephone: (404) 442-8776
Facsimile: (404) 537-5555
droberts@hagllp.com

-and-

**HALUNEN LAW**

Clayton D. Halunen (*pro hac vice application to be submitted*)
MN Bar No. 219721
Mack H. Reed (*pro hac vice application to be submitted*)
MN Bar No. 398703
Stephen M. Premo (*pro hac vice application to be submitted*)
MN Bar No. 393346
Christopher J. Moreland (*pro hac vice application to be submitted*)
MN Bar No. 278142
Kaarin S. Nelson Schaffer (*pro hac vice application to be submitted*)
MN Bar No. 386919
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Telephone: (612) 605-4098
Facsimile: (612) 605-4099
halunen@halunenlaw.com
reed@halunenlaw.com
premo@halunenlaw.com
moreland@halunenlaw.com
nelsonschaffer@halunenlaw.com

*ATTORNEYS FOR PLAINTIFF JESS KRUCHOSKI*

## CERTIFICATE OF SERVICE AND COMPLIANCE WITH FONT SIZE AND TYPE

I hereby certify that the foregoing has been prepared with Times New Roman font in 14 point size, as approved by the Court in N.D. Ga. Local Rule 5.1(c).

*/s/ David Allen Roberts*
David Allen Roberts
Georgia Bar No. 608444

4816-6930-3107, v.  1

36